## In re Philadelphia Company for Guaranteeing Mortgages, Trustee. No. 2

*Charles I. Thompson* and *Thomas Burns Drum*, for Land Title Bank & Trust Company, substituted trustee, accountant.

*Anthony H. Whitaker*, for Committee for the Protection of Bondholders.

*Maurice A. Granatoor*, for Betty R. Granatoor, exceptant.

*Clarence K. Gundaker*, for Estate of Clarence B. Kugler, deceased, a bondholder.

BROWN, J., July 14, 1939.—The first account of Land Title Bank and Trust Company, substituted trustee under mortgage secured upon premises situated at the northeast corner of 47th and Pine Streets, Philadelphia, known as Garden Court Apartments, was presented to the Court for audit on June 26 and 27, 1939. . . .

*Exceptions to the Account.*

Eleven exceptions to the account were filed by Betty R. Granatoor, the holder of $30,000 of the bonds totaling $1,100,000 secured by the mortgage . . . only the three exceptions noted need be considered.

The exceptions are to credits claimed by accountant. The second is to payments made to the Mortgage Service Company as agent's commissions; the fifth is to disbursements for salaries to superintendent of maintenance, leasing agent and manager, and the sixth is to payments on a contract for elevator maintenance.

Accountant was appointed substituted trustee on October 1, 1935, under the mortgage. This was in default by reason of the failure of the mortgagor to pay or cause to be paid the principal amount of the mortgage due on September 15, 1932, interest thereon due on that date and subsequently, and the taxes on the property since 1931, and so the trustee was authorized, under Article IV, Section 5, to enter upon the property and to "operate the same" itself "or by its agent."

The property is a six-story building, containing 100 separate apartments, approximately 550 rooms, and 250 bathrooms, as well as a dining room, a bar and a swimming pool. It is thus clear that in order to operate it properly the services of a number of employees with various qualifications were required, and that they be supervised by persons having requisite experience and ability. Its management was a substantial undertaking, one involving manifold duties of such nature that the trustee was entitled to employ such agents and others as were reasonably necessary.

When accountant assumed its duties as trustee, counsel was consulted as to whether or not an agent might be properly employed to manage the property, and having obtained an opinion that this might be done, the question was discussed with the general committee for the protection of bondholders, which suggested the employment of the Mortgage Service Company. This company had been managing the property for the receivers of the Philadelphia Company for Guaranteeing Mortgages, accountant's predecessor as trustee, and after investigating its qualifications to do this work, and being satisfied in respect thereto, accountant employed it as managing agent of the property. The commissions agreed upon were in accordance with the schedule promulgated by the Philadelphia Real Estate Board for managing agents, except that certain ones, which it is not necessary to enumerate, were waived by the Mortgage Service Company. The services performed by that company included the supervision of

the operation of the property, and the problems arising in connection therewith were frequently discussed with and considered by accountant. That it was necessary for accountant to employ a real estate agent to manage the property appears from the uncontradicted testimony of two experts on this subject. Indeed, one of them stated, "it was absolutely essential." Although accountant was managing real estate, including apartment houses, it was not equipped, upon its appointment, to attend to the leasing in an apartment building of the type and size of this property, and it was not until later, after it had been appointed substituted trustee under mortgages on a number of properties, some similar in character to and others differing from this one, of which the Philadelphia Company for Guaranteeing Mortgages had also been trustee, that its property management department was organized. It is apparent, therefore, that accountant exercised its best judgment in employing a real estate agent, such as the Mortgage Service Company, and in continuing such employment until the conclusion was reached that it was in a position to undertake the active and direct operation of the property itself.

The necessity of employing a resident manager is obvious. The running of a restaurant, with daily purchases of supplies and service of meals, was sufficient to warrant the presence at all times of a capable man. The bar also required, in order that it be profitable, the direct supervision of an authoritative head. The financial success of the swimming pool depended upon careful attention. That it was both necessary and customary to employ such a manager for an apartment building such as this, and to deduct his salary, which was fair and reasonable, from the proceeds of operation, and not from the agent's commissions, appears from the uncontradicted testimony of two witnesses familiar with such matters.

A reliable night watchman was also employed, and that he was qualified to act as assistant to the manager, being given the title of leasing agent, did not affect the necessity

or importance of his services, or the fairness and reasonableness of his compensation.

The superintendent of maintenance had oversight of the mechanical plant, and, according to the uncontradicted testimony of two qualified witnesses, the services of such a man were necessary, and his salary was fair and reasonable, as well as being properly payable out of operating receipts.

There are eight elevators in the property. The machinery and equipment thereof were in such poor condition that constant attention was necessary. The Otis Elevator Company was, therefore, employed under a contract for full maintenance, this being, in the considered judgment of accountant, the best method of handling the situation.

Accordingly, there appears to have been no abuse of discretion upon the part of accountant in respect to the items which exceptant has questioned. The services of the various employes were necessary, and the compensation paid was reasonable and proper. By the terms of the mortgage, referred to above, accountant was authorized to have an agent manage the property, and although it might well have delegated entirely to the agent employed the operation of the building, it did not do so, but exercised supervision thereof, frequently discussing and considering the various problems of administration which arose.

Furthermore, the mortgage provided, in Article V, Section 2, that the trustee shall not be "responsible for any exercise of judgment or discretion in any case in which such discretion is allowed or given it," nor liable for anything "except its own wilful and intentional breaches of the trust herein expressed and contained." Such provisions "exempting it from liability except for gross negligence or wilful and intentional breach of trust are valid and enforceable": Gouley v. Land Title Bank and Trust Co., 329 Pa. 465, 470. Hence, as none of accountant's acts, which are the subject of the exceptions, may be described as grossly negligent or in wilful and

intentional breach of the trust, the exceptions to the account must be dismissed.

During the audit, in cross examining accountant's assistant property manager and officer, counsel for exceptants asked him: ". . . specifically what services did they (Mortgage Service Company) perform?" This was objected to by counsel for accountant, and the objection was sustained. This ruling, it is contended, was error.

The notes of testimony disclose that the ruling was made because such testimony would have been merely a repetition of the testimony of the first witness called by accountant, who had been employed by the Mortgage Service Company supervising generally the management of apartment houses, and who had stated at some length, both upon direct and cross examination, what services that company had performed in connection with the property under consideration. True, the first witness was the "agent," and the second one was the "trustee," but the services performed were those of the former, and so he was the better qualified to state specifically what he had done.

It is to be noted that exceptant and her counsel had been afforded opportunity to examine all records of accountant in advance of the audit, and also that the ruling did not bar the answering of questions dealing with particular subjects or items, many of which were put to the witness, but only his giving a summary in detail of what already appeared of record. It has not been pointed out, however, in what respect, if at all, exceptant has been injured or harmed, and so further discussion is unnecessary.

*Sinking Fund.*

The reason for filing the account was to obtain a determination of accountant's duty in respect to $28,179.09 of cash and certain securities held in the sinking fund account.

The mortgage provided in Article II, Section 2, that the mortgagor shall pay or cause to be paid to the trustee

semi-annually the sum of $12,500, and that the trustee shall apply such sums "to the purchase at par and cancellation of the bonds hereby secured to the amount so received by the said Trustee, and in case it shall not be possible to obtain bonds at par and interest then such sums of money shall be invested by the said Trustee in guaranteed bonds and mortgages at the then prevailing guaranteed rate of interest to cover the period of maturity of the bonds hereby secured, or until the whole principal debt shall fall and become due and payable according to the provisions contained in the said bonds and of this Indenture of Mortgage."

Various payments totaling $100,000 were made to accountant's predecessor as trustee, the Philadelphia Company for Guaranteeing Mortgages, which did not purchase bonds secured by the mortgage, but bought other bonds and mortgages guaranteed by it. Upon accountant's appointment as substituted trustee on October 1, 1935, it received from the prior trustee a number of such securities and some cash. As the result of reorganizations of various properties securing the bonds and mortgages or of sale pursuant to offers made to all bondholders, accountant has now in this sinking fund account the sum of $28,179.09 in cash and a number of securities.

Several questions have been submitted for consideration. Should the *cash* in the sinking fund be applied to the payment of taxes? Should it be used to purchase bonds secured by the mortgage? Should it be distributed pro rata to the bondholders? Should it be invested? Should the *securities* be converted into cash, or should they be retained? The determination of these questions depends upon various factors.

At the time of accountant's appointment as substituted trustee, the mortgage was in default, as noted above, by reason of the failure of the mortgagor to pay or cause to be paid the principal amount of the mortgage due on September 15, 1932, interest thereon due on that date and subsequently, and the taxes on the property since 1931.

The unpaid registered delinquent taxes amounted to $136,802.98, and as the result of accountant's management and operation of the property, the sum of $105,-444.47 had been applied to the payment of current and delinquent taxes by December, 1938. It then became apparent that if, in addition to the moneys arising from the operation of the premises, $11,030.52 could be raised, the property could be brought within the provisions of the law pertaining to the abatement of taxes, thereby saving approximately $37,000 on account of interest and penalties. After communicating with the holders of the bonds secured by the mortgage, and at the request of 79 per cent of them, accountant advanced to the trust estate the amount specified. Consequently, the property was thus placed. But to maintain this position, it will be necessary to pay $52,400 on or before December 31, 1939; $29,000 on or before June 30, 1940, and $52,400 on or before December 31, 1940, on account of current and delinquent taxes. As the net operating income, before the payment of taxes and interest, amounted to $108,867.15 for the two-year period from July 1, 1936, to June 30, 1938, it appears probable that such income will be sufficient to pay in December, 1939, the amount necessary to maintain the property's position within the tax abatement law.

That accountant should at this time purchase bonds secured by the mortgage at par would be not only unwise, in view of the tax situation and of the fact that the mortgage has been in default for seven years, but also unfair and inequitable to the holders of bonds which were not so purchased, for it is extremely doubtful that the trust estate, i. e., the property and the sinking fund, will be sufficient to pay the holders of bonds the par value thereof.

The distribution of the cash in the sinking fund pro rata among all the bondholders at this time would also be unwise, because of the small amount which would be payable to each one, and the expense incident to calling in the bonds and stamping thereon the amount paid.

Counsel for the General Committee for the protection of bondholders, representing approximately 70 per cent of the bonds secured by the mortgage, the total issue being $1,100,000, stated at bar that "it is the conclusion of the General Committee that the fund should be applied to the payment of taxes; that the interests of the bondholders will be best protected in that way, and that by using the funds it will be possible to keep the property for the time being within the Tax Abatement Act [June 19, 1939, P. L. 405], which will effect very substantial savings in the taxes, which will redound to the benefit of the bondholders." Counsel for the holder of $30,000 of the bonds concurred in this, and although all bondholders were notified that the "reason for filing the said account is to obtain a determination of" accountant's duty in respect to the cash and securities in the sinking fund account, no one voiced any objection to the use of the fund for the payment of taxes, or made any suggestion other than that mentioned.

It appears, however, that this is not the proper time to decide whether or not accountant may or should utilize the cash and securities in the sinking fund account for the payment of taxes. Indeed, it may never be necessary to do so. The net operating income may be sufficient, as pointed out above, to pay in December, 1939, the amount necessary to maintain the property's position within the tax abatement law, and likewise thereafter, though this is problematical, for what may occur in the future is, of course, uncertain. It may be that accountant will obtain title to the property by foreclosing the mortgage (a bill in equity having been filed by it for that purpose on June 2, 1939), and then sell or reorganize it for the benefit of the bondholders whom it represents. In such event the Court will have to determine what disposition should be made of the sinking fund, which is an asset of the trust estate. If it were adjudicated now that this fund should be applied to the payment of taxes, such an order might have to be vacated, otherwise accountant might be handi-

capped in obtaining the best possible result for the bondholders. It appears advisable, therefore, that no conclusion should be reached at this time. Leave, however, is given accountant to renew its application whenever in its opinion a definite determination of the question is required.

Although, in recommending that the sinking fund should be applied to the payment of taxes, counsel for the bondholders made no distinction between the cash and the securities in the account, it is the opinion of accountant that to sell the latter in the present market would result in undue sacrifice. Accordingly, it suggests that it be directed to hold them, subject to further order of the Court. This is approved.

Whether or not the cash in the sinking fund account should be invested depends upon what accountant's conclusion is with respect to the future administration or disposal of the trust estate. Its duty is, of course, to make the estate productive, and if the retention of cash will be effective to that end, it may hold it as such, but if not, then it should be governed accordingly.

One other matter was referred to, and as it is involved in the administration of the trust, reference thereto seems appropriate. The mortgagor was I. Clarence Pennington, but the property has been and is now owned by Clarence R. Siegel, trading as Garden Court Apartments. As registered owner, he is liable for the payment of the taxes. Besides, he executed and delivered to the prior trustee his collateral bond, in which he assumed liability for all the terms, covenants and conditions of the mortgagor contained in the mortgage. Among these were the payment of the principal of the mortgage, the payment of interest thereon, the payment of taxes and the sinking fund payments. As he and the mortgagor have failed to pay the taxes, there is no valid objection, in so far as they are concerned, to the utilization of the sinking fund for that or any other purpose, providing, of course, that they are credited on account of the mortgage with the actual

amount paid into the sinking fund. To that extent they complied with their covenants, and such performance must be fully recognized and sustained. When, however, such payments were made, not only did their obligation with respect thereto cease, but they had no further interest therein. It then became the duty of the trustee to apply the sums so received for the benefit of the bondholders.

The account is, therefore, confirmed; the exceptions thereto are dismissed, and awards are made accordingly.

The Prothonotary will forthwith notify counsel of the filing of this adjudication; and further that if exceptions are not filed thereto within ten days after receipt of said notice, the adjudication will become absolute.